UNITED STATES of America,
Plaintiff,

v.

The J. R. WATKINS COMPANY, a Delaware corporation, The J. R. Watkins Company, a Maryland corporation, E. L. King, Jr., Howard F. Williams, Ralph G. Boalt, Louis W. Goldberg, William M. Bright, Clarence C. Currier, John Fedders, E. C. Baumann, James Murphy, E. M. McCullough, Lewis E. Fickett, Louis A. Dischler, C. R. Birckhead, Defendants.

Cr. A. No. 7574.

United States District Court,
D. Minnesota, Third Division.

Dec. 2, 1954.

George E. MacKinnon, U. S. Atty., St. Paul, Minn., appeared in behalf of the United States.

Linus J. Hammond, St. Paul, Minn., and C. Stanley McMahon, Winona, Minn. (Norman J. Morrisson, Washington, D. C., of counsel), appeared in behalf of the defendants.

NORDBYE, Chief Judge.

This case is a prosecution for conspiracy to violate the internal revenue laws and for specified violations thereof. The indictment, which was sustained by this Court against defendants' motion to dismiss in United States v. J. R. Watkins Co., D.C., 1954, 120 F.Supp. 154, charges *inter alia,* that defendants conspired together to commit offenses against the United States and to defraud it by selling for internal human purposes liniment made with specially denatured alcohol without payment of the tax due thereon. It also alleges the continuance of this conspiracy from September, 1928, to September 30, 1950, and concludes with allegations of overt acts allegedly committed in pursuance of the conspiracy.

In 1945, the corporate defendants in this case entered into a compromise with the Commissioner of Internal Revenue. It covered all civil and criminal liability of the corporation for violations of the internal revenue laws due to the withdrawal and use by the corporation or its officers, directors and employees of specially denatured alcohol in the manufacture and sale of liniment for internal human use. The existence of the violations referred to in the compromise was discovered as a result of an offer made by Mr. E. L. King, Jr., on February 3, 1944, to make a voluntary disclosure concerning all federal tax liabilities of any nature concerning Mr. E. L. King, Sr., members of his family, and their several corporations.

The Government has shown by its bill of particulars filed July 19, 1954, in response to the order of this Court that, in proving the charge of a continuing conspiracy from 1928 to 1950, it will rely upon acts committed by the defendants prior to the compromise, including withdrawal and use of specially denatured alcohol in the manufacture of liniment without paying the tax thereon, mislabeling such liniment with labels bearing directions for internal use, and the preparation of advertising material encouraging the internal use of this liniment. It is clear that, so far as these acts constituted offenses under the internal revenue laws, those offenses were compromised. In addition, the Government indicates that as evidence of the existence of the conspiracy since 1928, it will offer the compromise itself and the report, including as it does signed statements of former employees of the Watkins companies submitted by the defendants disclosing the violations ultimately compromised. Defendants' motion seeks to have suppressed said report and com-

promise, all evidence obtained on account of the aforesaid compromise, and all evidence that tends to establish that any defendants, or any other person who was an officer, director or employee of the J. R. Watkins companies, violated or conspired to violate any internal revenue laws or regulations relating to the withdrawal or use of specially denatured alcohol or possession, sale or use of liniment made with such alcohol between 1928 and October 31, 1944.

The bases for the motion are the contentions (1) that the evidence made available to the Government as to the alcohol tax liability of the corporation constituted a "voluntary disclosure" within the policy announced by the Bureau of Internal Revenue to the effect that criminal prosecution would not be recommended in cases where a taxpayer voluntarily discloses his tax liabilities, makes good the delinquency with interest, and pays the civil penalties consequent therefrom; and (2) that since the compromise covered *all* civil and criminal liability of the defendants arising under the internal revenue laws, the Government now is foreclosed from prosecuting defendants through the device of a conspiracy indictment for the same acts which gave rise to the offenses compromised. The latter contention is the one most heavily relied upon. The defendants point out that the compromise covered not only the physical acts of withdrawing and using specially denatured alcohol and possessing and selling the liniment manufactured therefrom, but also any lack of "good faith" in conforming to the provisions of the code, any "attempt" to withdraw alcohol tax free, any "intent" to use any property in violation of any internal revenue law, any "wilfull attempt" to evade the tax in any manner, and any acts which aided or abetted the commission of the foregoing violations. They contend that the distinction between such substantive offenses and the offense of conspiracy is too nebulous to sustain the present prosecution for conspiracy covering the same period of time. They also contend that the principle of collateral estoppel prevents relitigation of the facts involved in the compromise.

The defense that the substantive offenses which were compromised are indistinguishable from the offense of conspiracy is, whatever defendants label it, essentially one of double jeopardy. The issue is not whether the offense under indictment is "covered" by the compromise in a contractual sense, but whether the compromise forbids this prosecution by necessary operation of law. For these purposes, of course, the compromise must be considered to be as complete a bar to subsequent prosecution as a final judgment of acquittal or conviction. United States v. Chouteau, 1880, 102 U.S. 603, 26 L. Ed. 246; see Oliver v. United States, 4 Cir., 1920, 267 F. 544, 548. However, it is clear that the compromise, like a conviction or acquittal, is not a bar to a subsequent prosecution merely because the same activity is the basis for both. The test is whether the defendant has previously been put in jeopardy for the same offense, and if one act is made a violation of two statutes, double jeopardy does not prevent a conviction under both if either statute requires proof of an additional fact which the other does not. Carter v. McClaughry, 1902, 183 U.S. 365, 22 S. Ct. 181, 46 L.Ed. 236.

It is fundamental that a conspiracy to commit a crime is distinct from the crime itself and that the accused can, therefore, be convicted of both. Carter v. McClaughry, supra. Further, it is immaterial that the Government seeks to convict both for conspiracy and for an attempt to commit a given crime. For while an attempt may be committed by one person alone, conspiracy requires concert of action between two or more. Further, while the crime of conspiracy requires that one of the conspirators have done an act to effect the object of the conspiracy, 18 U.S. C. § 371, it is not essential that the overt act be a crime in itself. Therefore, the substantive crime is not necessarily an ingredient of the conspiracy, and a de-

fendant may be convicted and sentenced both for attempt and for the conspiracy to commit the same crime. United States v. Wexler, 2 Cir., 1935, 79 F.2d 526; see Brown v. United States, 8 Cir., 1948, 167 F.2d 772.

It seems obvious that most of the other "offenses" compromised, i. e., lack of good faith and intent to violate the law, are distinct from the crime of conspiracy because they can be proved without showing a scheme between two or more persons—which is, of course, the *sine qua non* of conspiracy.

It is more difficult to perceive a distinction between the charge of conspiracy to commit a crime where the overt act relied upon is the crime itself and the charge that a defendant has aided and abetted another in the commission of the crime. For the offense of aiding and abetting by counseling or commanding another to commit a crime requires a showing of a "community of unlawful purpose" as well as the commission of the crime itself. Johnson v. United States, 8 Cir., 1952, 195 F.2d 673, 675. However, part of what was said regarding the distinction between conspiracy and attempt is also applicable here. The acts constituting the basis of the charge of aiding and abetting obviously must be acts which tend to the commission of some substantive offense, while the overt act necessary to a conspiracy conviction may in itself be innocent. More fundamental is the fact that while "aiding and abetting" might be thought of as an offense in itself, it is not an independent crime under the "aider and abettor" statute. The statute, 18 U.S.C. § 2, itself provides no penalty, but only abolishes the distinction between the common-law notions of "principal" and "accessory". Under it the acts of the actual perpetrator become the acts of the aider and the latter can be charged with having done the acts himself. Gelbach, Res Judicata and Conspiracy, 39 J.Crim.Law 58, 60. A person may be indicted for commission of the substantive crime and convicted by proof showing him to be an aider and abettor.

See Johnson v. United States, 9 Cir., 1932, 62 F.2d 32; Colbeck v. United States, 7 Cir., 1925, 10 F.2d 401, 403. It would seem that the general principle that one may be convicted both of conspiracy and the substantive crime should not be altered merely because the Government establishes the substantive crime by showing that the defendant's participation therein was as aider and abettor. See Nye & Nissen v. United States, 1949, 336 U.S. 613, 69 S.Ct. 766, 93 L.Ed. 919.

Whether upon these bases or some other, it seems well established that aiding and abetting in the commission of a crime is distinct from a conspiracy to commit the crime. Thus neither a conviction nor an acquittal of one is *per se* a bar to prosecution for the other. United States v. Sealfon, 3 Cir., 1947, 161 F.2d 481, reversed on other grounds, 332 U.S. 575, 68 S.Ct. 237, 92 L.Ed. 180; Bens v. United States, 2 Cir., 1920, 266 F. 152; Louie v. United States, 9 Cir., 1914, 218 F. 36. It must be conceded that in the very recent case of Cosgrove v. United States, 9 Cir., 1954, —— F.2d ——, a previous acquittal of the defendant on charges of conspiring to defraud the Government of the penalties due it for the defendant's failure to file his tax returns promptly was, in effect, a bar to a subsequent prosecution under 26 U.S. C. § 3793(b) (1) for aiding and abetting the Deputy Collector of Internal Revenue to falsify the date on defendant's return. However, that opinion does not purport to be a decision on the double jeopardy issue and ignores completely the line of cases holding that there is a distinction between conspiracy and aiding and abetting, including the Ninth Circuit's own case of Louie v. United States, supra. The opinion purportedly is based upon the theory of collateral estoppel, and rests almost exclusively upon the authority of Sealfon v. United States, 1948, 332 U.S. 575, 68 S.Ct. 237, 92 L.Ed. 180. The Sealfon case, of course, establishes only that collateral estoppel may be a defense to a prosecution even though double jeopardy is not. The Cosgrove case,

therefore, should be construed in light of the teachings of the Sealfon case, and that is that the general verdict of acquittal in the first case against Cosgrove necessarily was a finding of fact inconsistent with the verdict of guilty under the second indictment.

If a judgment of conviction or acquittal of aiding and abetting is not *per se* a bar to a prosecution for conspiracy, it would seem, *a fortiori*, that a compromise of aiding and abetting would likewise be no bar to a subsequent prosecution for conspiracy. Defendants seem to argue, however, that a compromise not only has all the attributes of a judgment, but is also similar to a pardon and therefore not only prevents the defendants from being further punished for the same offense, but blots out completely the fact that acts were done which constituted the crime. It is not clear from the opinions of Ex parte Garland, 1866, 4 Wall. 333, 71 U.S. 333, 18 L.Ed. 366, and Carlisle v. United States, 1872, 16 Wall. 147, 83 U.S. 147, 21 L.Ed. 426, whether a pardon, or act of general amnesty, as was involved in the latter case, "obliterates" acts or offenses. In any event, United States v. One Five-Passenger Ford Automobile, D.C.W.D.Wash., 1920, 263 F. 241, holds no more than that a compromise covers the offense and the penalty provided therefor. And even if a pardon or general amnesty, founded as they both are upon considerations of mercy, might be construed broadly by the courts so as to relieve completely the beneficiary thereof from fear of prosecution for his misconduct, it seems to the Court that the analogy to compromise is inapt. Here, we have no act of charity by the sovereign. We have a specific compromise statute which authorizes an administrative authority to accept, in furtherance of the interests of the United States, settlements of criminal and civil liability. These settlements are not acts of forgiveness, but acts of expediency based most often upon the decision by the administrator that chances of conviction are somewhat in doubt. They are made in contemplation of specific statutes, take into account specific penalties, and are intended to have whatever legal operation that a judgment under those statutes could have, no more and no less. The Court concludes, therefore, that the compromise does not provide a more formidable bar to this prosecution than would either a judgment of acquittal or conviction.

Defendants next contend that there is a rule of law which prevents the United States from showing that defendants committed the pre-1944 violations which were compromised, even though there is a lack of identity between those substantive offenses and the conspiracy charged. They point out that the principle of collateral estoppel, one of the components of res judicata, can be invoked to prevent relitigation of issues determined in a previous lawsuit between the same parties even though the subsequent proceeding is based upon a different offense. It is, of course, perfectly true that collateral estoppel may be a defense to a prosecution although double jeopardy is inapplicable because there is not an identity of offenses, Sealfon v. United States, 1948, 332 U.S. 575, 68 S.Ct. 237, 92 L.Ed. 180, and is therefore in one sense broader than the application of res judicata as a complete merger or bar, or the constitutional counterpart thereof, double jeopardy. However, in another sense collateral estoppel is narrower—for the latter doctrine can only foreclose the litigation of issues which have actually been litigated and determined in the previous proceeding. Restatement, Judgments § 68 (1942). It recently has been held that an action dismissed with prejudice by stipulation of the parties would be a bar to the plaintiff's reassertion of the same cause of action, but that collateral estoppel could have no application because the case never was tried and therefore there was not such a finding of fact as would prevent the parties from questioning that finding thereafter. Lawlor v. National Screen Service Corp., 3 Cir., 1954, 211 F.2d 934. Further, the Supreme Court has held in a case involving a con-

sent judgment rendered by the tax court, that such a judgment was only an acceptance by the court of an agreement between the parties to settle their controversy and since there had been no hearing, no stipulations of fact, no briefs filed, no oral argument, and no showing that the issues were determined by the prior proceeding, the judgment could have no effect as collateral estoppel. United States v. International Building Co., 1953, 345 U.S. 502, 73 S.Ct. 807, 97 L.Ed. 1182. It is difficult to see, therefore, how the doctrine of collateral estoppel could be applied to a compromise. What facts were determined by the compromise which was accepted by the Commissioner—that the defendants were innocent of the charge against them or that they were guilty? Generally, it may be stated that a compromise is not a determination either of a defendant's guilt or his innocence. For a compromise by its inherent meaning is a blending of the extremes. Presumably, it is just as consistent to find that a compromise has the effect of a judgment of guilty as that of innocence. The payment of money to the Government in the compromise would indicate that the defendants were subject to a penalty. Although the doctrine of collateral estoppel is applicable in a criminal case regardless of whether the defendant was found guilty or innocent, the doctrine will not avail the defendant if he is found guilty unless the former conviction was based upon facts which negative the possibility of guilt in the second prosecution. In considering the question of double jeopardy, it is immaterial whether the finding in the prior proceeding was that of guilt or innocence if there is an identity of offenses. Either finding will support such a plea. But in this compromise, we have neither a finding of guilt nor a finding of innocence which may form the basis as to any factual issue of the application of a collateral estoppel. There is an absence of any showing here that the compromise between the parties determined any question of fact so as to negate the possibility of defendants'

guilt of the conspiracy charged in this indictment during the period involved herein.

None of the authorities relied upon by defendants suggest any contrary conclusion. United States v. Chouteau, 1880, 102 U.S. 603, 26 L.Ed. 246, did hold that a compromise of an alcohol tax violation barred a subsequent action against the violator on his distillery bond for breach of his promise not to violate the law relating to the business of distillers. However, the Supreme Court in that case did not attempt to interpolate a finding of fact into a compromise. The decision of the court was rather that the prior compromise was a complete bar to the subsequent civil action upon the theory that "all of the evidence which would be necessary to establish, and competent [in the action on the bond] * * * would also be competent under and would tend to establish the allegations of said indictments; * * *." The "same evidence" test is that invoked to determine identity of offenses for purposes of merger, bar, and double jeopardy, and is completely extraneous to the application of collateral estoppel. The decision of the court in the Chouteau case perhaps is summarized best at 102 U.S. 611,

> "* * * He [the defendant] has been punished in the amount paid upon the settlement for the offence with which he was charged, and that should end the present action, *according to the principle on which a former acquittal or conviction may be invoked to protect against a second punishment for the same offence.*" (Emphasis supplied).

Moreover, it may be noted that there is a note to the Chouteau case, and Justice Field, who wrote the opinion in that case, also wrote the short note in United States v. Ulrici, 102 U.S. 612 note, 26 L.Ed. 249 note, which was a companion case. There, Ulrici, the principal on the bond, had entered a plea of guilty to the indictment found against him and was fined $1,000 and imprisoned

for one day. Nevertheless, the court in the action upon his bond found that the principles of the Chouteau and Ulrici cases were the same, concluding that "the punishment inflicted was for offenses which are set forth in the petition in this action as breaches of the condition of the bond." The decision in the Ulrici case is consistent only with the conclusion that the identity of offenses precluded the action on the bond. But however we consider a compromise as being effective as an acquittal or as a conviction, we have in this compromise no finding of fact which can be considered as a definitive disposition of any factual disclosure made by the defendants in the compromise so as to give rise to the doctrine of collateral estoppel. Certainly, there is no showing that the Commissioner assumed to decide the complicity of anyone connected with the offenses referred to and no attempt was made to set at rest by way of finding any phase of the disclosure except that the parties could not be prosecuted civilly or criminally on the offenses disclosed.

Defendants' final argument is that much of the evidence which the Government proposes to use at the trial was disclosed voluntarily to the Commissioner of Internal Revenue with the expectation that because the disclosure was voluntary, the policy of the Bureau would prevent the defendants from being indicted upon the basis of the liabilities disclosed. Numerous cases have reached the federal courts in recent years in which the defendant has contended that the Bureau's voluntary disclosure policy prevents use against him of evidence which he turned over or made available to the Bureau in reliance upon its promise that it would not recommend criminal prosecution. In many cases it has been assumed without discussion that if the facts were as contended by the defendant, the "voluntary disclosure" policy would prevent use of the evidence. See the discussion of these cases and of this policy in Balter, Fraud Under Federal Tax Law, 101–132 (2d ed. 1953). But apparently only one case—In re Liebster, D.C.E.D.Pa.,

1950, 91 F.Supp. 814, 817—has held that the claimed voluntary disclosure did prevent use of the evidence. That decision is in the form of findings of fact and conclusions of law, and therefore offers no discussion of the basis upon which this administrative policy can become a legal basis for the suppression of evidence in a criminal prosecution. It does, however, conclude as a matter of law that "The evidence * * * should be suppressed on the ground that if used petitioner's rights under the Fifth Amendment to the Constitution would be violated."

It has been suggested that a motion to suppress evidence and sworn statements voluntarily given to Treasury agents in reliance upon a promise that prosecution would not be recommended might be based upon the constitutional privilege against self-incrimination. See Balter, supra, at 124. Ordinarily, of course, a taxpayer could not be compelled to turn over to investigators his books and records, be compelled to sign self-incriminating statements, or engage accountants to prepare records of his tax delinquencies. And it might be argued that if he does so only upon the representation by the Bureau that such disclosures will not be used to convict him of criminal fraud, he cannot be held to have waived his constitutional rights. Further, it has been suggested that even though this constitutional argument may be invalid, federal courts perhaps should formulate a rule of evidence to the effect that evidence voluntarily disclosed on the faith of the announced voluntary disclosure policy should be excluded from evidence in the event of a subsequent indictment of the taxpayer. Centracchio v. Garrity, 1 Cir., 1952, 198 F.2d 382, 388.

It is evident that both these theories are dependent upon the supposition that the disclosure was brought about by the affirmative representations of the Treasury or its agents. Without such affirmative representations, therefore, the fact of the disclosure is legally impotent. For absent such representations, the voluntary disclosure policy

would be just that—an intradepartmental statement, never authorized by statute or codified in the regulations that internal revenue officials should exercise in a certain manner the discretion vested in the Bureau as to whether or not to recommend prosecution in a given case. Certainly, the Bureau has no authority to create by such a statement of policy an immunity from prosecution. And surely this Court has no authority to review the manner in which the Bureau exercises its discretionary authority, at least in absence of a contention that the action of the Bureau is unconstitutional.

The evidence in the case at bar clearly shows that, although the voluntary disclosure policy existed in its present form as long ago as 1934, no public announcements were made until August, 1945, to the effect that, given a voluntary disclosure, the Bureau would not recommend prosecution. Prior to 1945, this policy could be found only in a confidential Bureau mimeograph from the Commissioner to his officials and agents. Not until 1945, when the Treasury began a large-scale drive to discover black-market operators and tax violators, was it decided that this policy would be publicized and offered as an inducement to tax law violators to report their delinquencies. This was done through press releases and radio broadcasts.

 It is clear that the officers of the defendant corporation made their offer to disclose the corporate liabilities at least a full year before any public announcement of the voluntary disclosure policy. In doing so they must be held to have acted at their own risk. They had not been induced, tricked, or deluded into making the disclosure. They did so freely and knowingly, and presumably under the advice of counsel that prosecution might well be recommended in their case. They are in substantially the same position as would be a taxpayer who made such a disclosure after 1952, when the Bureau abandoned the voluntary disclosure policy, at least as a formal public invitation to taxpayers to disclose. Such a taxpayer, like the present defend-

ants, would not be in a position to contend that he was induced by public announcement to make the disclosure that he made. And since the evidence in the present case does not show that the defendants were personally deceived by any agent of the Internal Revenue Bureau into making the disclosure, they cannot contend that, by reason either of the Fifth Amendment to the Constitution or of a rule of evidence based upon notions of estoppel, they are entitled to suppress this evidence.

Defendants have offered in evidence on this motion two certified copies of letters written by agents of the Internal Revenue Bureau on file in the Treasury Department. Nothing in these letters, however, appears to shed any light upon the issues upon which the foregoing decision is based. Therefore, the question of their admissibility becomes moot.

It follows that the motion of the defendants to suppress must be denied in its entirety. It is so ordered.

An exception is allowed.