**UNITED STATES of America**
v.
**Anthony PROVENZANO, Appellant.**
**No. 14614.**

United States Court of Appeals
Third Circuit.

Argued March 12, 1964.

Decided June 30, 1964.

Rehearing Denied July 28, 1964.

Henry G. Singer, Brooklyn, N. Y. (Martin D. Moroney, Newark, N. J., Morris A. Shenker, St. Louis, Mo., Jacob W. Heller, David Dretzin, New York City, of counsel, on the brief), for appellant.

Richard A. Levin, Asst. U. S. Atty., Newark, N. J. (David M. Satz, Jr., U. S. Atty., Newark, N. J., Matthew P. Boylan, Asst. U. S. Atty., on the brief), for appellee.

Before BIGGS, Chief Judge, and HASTIE and SMITH, Circuit Judges.

BIGGS, Chief Judge.

## I

### Facts

The defendant-appellant, Anthony Provenzano, was indicted on November 15, 1960, in a single-count indictment charging .him, an officer of Local 560, International Brotherhood of Teamsters (Local 560), with obstructing, delaying, and affecting interstate commerce from January 1, 1952 to June 1, 1959, by extorting through economic fear from Dorn's Transportation Company, Inc. (Dorn Company or the Company), or from Walter A. Dorn (Dorn), its Vice President in charge of operations, the sum of $17,100 in violation of 18 U.S.C. § 1951 (the Hobbs Act). The indictment is set out below.[1] Provenzano was convicted and has appealed.

The record discloses the following: On some date prior to January 1, 1952,

1. The indictment is as follows: "The Grand Jury in and for the District of New Jersey, sitting at Newark, charges:

"1. That at all times referred to hereinafter Anthony Provenzano was an officer of Local 560, International Brotherhood of Teamsters, Chauffeurs, Warehousemen and Helpers of America, whose principal place of business was located in Hoboken, New Jersey.

"2. That at all times referred to hereinafter Dorn's Transportation, Inc. was a corporation which had its principal office in Rensselaer, New York, which said corporation is hereinafter sometimes referred to as the 'Dorn Company'.

"3. That at all times referred to hereinafter the said 'Dorn Company' was engaged in the business of a common carrier of general commodities in interstate commerce.

"4. That on or about January 1, 1952 the 'Dorn Company' opened a terminal within the State of New Jersey at Secaucus, New Jersey.

"5. That from on or about January 1, 1952 to and including June 1, 1959, within the State and District of New Jersey, Anthony Provenzano did wilfully, knowingly and unlawfully obstruct, delay and affect interstate commerce by extortion, and the said Anthony Provenzano did obtain from the 'Dorn Company' and from Walter A. Dorn, an officer of the 'Dorn Company', and with their consent, the sum of $17,100.00, the payment of said amount having been induced by the said Anthony Provenzano by the wrongful use of fear of financial and economic injury to the business of the aforesaid company in the interstate transportation of general commodities as a common carrier.

"In violation of Title 18, U.S.C., Section 1951."

Dorn Company decided that it would move its trucking terminal from New York City to Secaucus, New Jersey, and did in fact move its terminal there on January 1, 1952. The Company executed a five-year lease with the owner of the premises at Secaucus at a monthly rental of $1700, paying the rent six months in advance. At some date, after January 1, 1952 but during the time the Company was still under the jurisdiction of New York Teamster Local 707, Provenzano and Anthony Castellito, business agents for Local 560, appeared at the Secaucus terminal and presented a contract with Local 560 bearing Provenzano's signature to the Company's terminal manager for execution. The Company executed this contract on a later date not critical here.

Labor problems seemed to develop almost as soon as the Secaucus terminal was opened. An early problem involved a day switcher, Melchiona, i. e., a yard man employed to connect and disconnect trailers to trucks at the terminal. There is evidence to support the conclusion that Provenzano wanted Melchiona made a full-time day-switcher at the Secaucus terminal. The Company apparently acceded to this desire. Soon thereafter a more serious labor problem arose. The drivers refused to back their trucks into the terminal bays at the Secaucus terminal and to "break" the trailers from the tractors in the bays, assertedly resulting in congestion of the terminal yard. There was testimony that it was the duty of the drivers to back their trucks into the terminal bays and break their units. The period of congestion, according to the Government's witnesses, lasted for from four to nine weeks, occurring in the first six months of 1952, although immediately following the move from New York to New Jersey the Company's business had not increased. The terminal managers testified that it was the refusal of the drivers to back their trucks into the bays and to break their units that created the congestion. The Company's Vice President of Sales, Hoeting, testified that during this period of congestion: "It wasn't one or two drivers, it was the group * * *", and that this "slowed down the operation." Garcia, a dispatcher and a terminal manager at Secaucus, testified that every driver refused to back his truck into the bays during the period of congestion. Dorn testified that "the operation had become expensive, service suffered, and we had a continual problem."

The record further shows that Dorn in 1952 was Vice President of the Company, that the enterprise was controlled by his brother, and that Dorn himself owned 15% of the stock. Garcia reported to Dorn that the drivers were refusing to back their trucks into the bays. Adelizzi, the general manager of the Empire State Highway Transportation Association, had apparently proved useful in settling the switching dispute referred to previously and for this reason Dorn again brought Adelizzi to New Jersey. Adelizzi testified that the Company had reported it was having difficulty with its men who in some respects "were really sabotaging the job with slowdowns, or refusing to do what they were told." When Adelizzi returned to New Jersey there was a meeting between him, Dorn, Provenzano, Castellito, Melchiona, and Hoeting in an effort to resolve the Company's troubles. The meeting ended at "loggerheads". There was a second meeting which was no more successful. Castellito and Provenzano had told Dorn that "the men don't have to do this," i. e., back their trucks into the bays and break them, that this was yard work under the New Jersey practice. There followed a meeting in late April or early May of 1952 between Dorn and Provenzano and Castellito. According to Dorn's statement he told Provenzano and Castellito on this occasion: "This is a situation we can't live with. We have to do something about it." He asked them why the problem could not be straightened out. They replied that Dorn would have to see them in order to adjust it. Dorn asked for time, stating that he had no authority or control over the Company and that he could not make payments. He testified that at this time he "had the

understanding that we were talking about the price of a man \* \* \* approximately $100 a week." In May 1952 the three men, Dorn, Provenzano, and Castellito, met again and Dorn testified that he told them that he was willing to do something but that he did not have access to this kind or type of money, i. e., $100 a week. He stated to Castellito and Provenzano in substance that if he could find a way he would be willing to pay. He was asked by counsel for the Government: "And what did you agree to do?" He replied: "The best I could \* \* \* I believe I felt that I had committed myself to the $100 a week if it could be possible."

In the latter part of May or in June 1952, Dorn met Provenzano and Castellito and on this occasion paid between $350 and $400 in cash to Provenzano in the men's room of the Swiss Town House, a restaurant. During the next fifteen months Dorn met Provenzano on three more occasions and paid him between $350 and $400 in cash on each occasion. Dorn testified on direct examination as follows: "Q. What was the reason for your agreeing to do whatever Mr. Provenzano and Mr. Castellito asked you?" "A. I felt it was necessary to the operation of our business." "Q. What had been the effect on the operation of your business?" "A. The operation had become expensive, service suffered and we had a continual problem." (Objections and rulings of the Court have been omitted from the foregoing quotation.)

Dorn testified that he had been making payments to the extent that he was able to do so and he had not advised the Company of the payments. If Dorn's testimony be believed it will be apparent that by mid-1953 he had been paying Provenzano at the approximate rate of $100 a month, i. e., at approximately $1200 a year, instead of the rate of $5000 a year as apparently had been contemplated.

On some date in the second quarter of 1953, at another meeting, Provenzano informed Dorn that he had a lawyer whom Dorn could put on retainer and gave Dorn a slip of paper bearing the name of Michael Communale. The pertinent conversation on this occasion between Dorn and Provenzano according to the testimony of Dorn on direct examination was as follows: "Q. How did the name Michael Communale come into this luncheon conversation between you and Mr. Provenzano?" "A. Mr. Provenzano mentioned Mr. Communale to me as a lawyer whom I could put on retainer." "Q. Had there been previous discussion with Mr. Communale with respect to placing a lawyer on a retainer—with Mr. Provenzano, rather?" "A. Not that I recall."

The court then asked: "Mr. Dorn, will you tell us what actually took place during the course of this discussion with Mr. Provenzano when the name of Michael Communale was mentioned? Now, tell us what happened." Dorn answered: "We had lunch and Mr. Provenzano mentioned to me that he had a lawyer. He gave me the name of the lawyer on a slip of paper. I mentioned the fact that in Albany we retained a lawyer at $200 a month. To the best of my recollection there was no specific demand made at that time, nor was there any discussion of the retainer fee." He was asked in respect to a letter of retainer [2] that he wrote Communale much later: "With re-

2. The letter, which is in evidence as Government's Exhibit 69, is as follows:
"Dorn's Transportation Inc.
"Rensselaer, New York
"August 10, 1953
"Mr. Michael G. Communale
591 Summit Avenue
Jersey City, New Jersey
"Dear Mr. Communale:
"We would like to have you accept a retainer from our company, in order for you to handle our legal matters regard-

ing the ton mile tax, and other legal matters that arise in the New York City, area, starting at once.
"We are sorry for the delay in writing this letter which we agreed to do when we originally discussed this matter.
"Very truly yours,
/s/ Walter A. Dorn
W. A. Dorn
Vice-President"
"WAD/vms"

spect to the substance of the letter, where did you get that information?" He replied: "Anthony Provenzano." Dorn testified in respect to the retaining of Communale that "it was the method of making the payment that I had committed myself to make at the second meeting in 1952." Dorn admitted that he had never met Communale. Compare the statement contained in the final paragraph of the retainer letter.

We deem further quotations from Dorn's testimony in respect to the engagement of Communale as unnecessary in this opinion.

The evidence shows that commencing on June 1, 1953, Dorn Company sent to Communale a check in the amount of $200 on or about the first of each month, every month until June 1, 1959, that the checks sent in September, October, November, December, 1953, and in January, 1954 were in the amount of $400 each. An examination of the evidence discloses only one mention of $200 as the amount of a monthly retainer in any conversation between Dorn and Provenzano.[3] The record also demonstrates that of the 73 checks sent by Dorn Company to Communale some were deposited in trust accounts and the rest were cashed. It will be noted that Dorn did not send the retainer letter (Government Exhibit No. 69) until August 10, 1953, and that it referred to an earlier conversation which the evidence seems to demonstrate never took place. The payments to Communale were carried on the books of Dorn Company as legal expenses.

The record also shows that on April 5, 1957, Dorn wrote Communale stating that he wished to cease retaining him

as of May 1, 1957 and to employ him on an individual case basis thereafter. This letter is in evidence as Government's Exhibit No. 27.[4] The evidence is clear, however, that the payments by Dorn Company to Communale continued despite the letter terminating Communale's retainer until June 1, 1959, and that until that day the monthly payments were made in the usual manner.

The evidence also demonstrates that Communale was Assistant Prosecutor of Hudson County, New Jersey, from 1952 to 1959; that while he was Assistant Prosecutor he maintained a private law office in Jersey City, New Jersey; that throughout the period during which he allegedly represented Dorn Company he never met Dorn; that he never spoke with anyone from Dorn Company; and that his communications with Dorn Company were limited to approximately half a dozen letters, which with the exceptions of the two set out in notes 2 and 4 of this opinion are without real significance and dealt with very minor matters.

The record further shows that during the entire period in which payments were made, the first and only labor grievance between Dorn Company and Local 560 occurred in January, 1959, but that in the period 1960 through 1962 eight labor grievances arose.

As was said by the Supreme Court in Glasser v. United States, 315 U.S. 60, 80, 62 S.Ct. 457, 469, 86 L.Ed. 680 (1942): "It is not for us to weigh the evidence or to determine the credibility of witnesses. The verdict of a jury must be sustained if there is substantial evidence, taking the view most favorable to the Government, to support

3. See Dorn's statement quoted in this opinion supra, viz., "I mentioned the fact that in Albany we retained a lawyer at $200 a month."

4. The letter, dated April 5, 1957, is as follows: "Mr. Michael G. Communale, Attorney-at-law, 591 Summit Avenue, Jersey City, New Jersey.

"Referring to your letter of February 28, 1957, I would like to advise you that it is our wish to drop our retaining status

as of May 1, 1957. Please indicate to me if it would be agreeable to continue to represent us in that area on individual cases.

"Very truly yours, Dorn Transportation, Inc.

Handwritten by the witness, "Walter A. Dorn.

Typewritten, "Walter A. Dorn, President.

"WAD/JMA."

it." For this reason we have found it unnecessary to recite here the evidence produced by Provenzano on his own behalf.

## II

### Issues of Law

(A) The Hobbs Act, 18 U.S.C. § 1951, in relevant part, provides as follows: *"Interference with commerce by threats or violence* (a) Whoever in any way or degree obstructs, delays, or affects commerce or the movement of any article or commodity in commerce, by robbery or extortion or attempts or conspires so to do, or commits or threatens physical violence to any person or property in furtherance of a plan or purpose to do anything in violation of this section shall be fined not more than $10,000 or imprisoned not more than twenty years, or both.

"(b) As used in this section * * * (2) The term 'extortion' means the obtaining of property from another, with his consent, induced by wrongful use of actual or threatened force, violence, or fear, or under color of official right. (3) The term 'commerce' means commerce within the District of Columbia, or any Territory or Possession of the United States; all commerce between any point in a State, Territory, Possession, or the District of Columbia and any point outside thereof; all commerce between points within the same State through any place outside such State; and all other commerce over which the United States has jurisdiction."

Preliminarily it should be pointed out that Provenzano, under the charge of the court, could not be convicted of an offense committed prior to November 15, 1955. In this respect the court charged: "[T]he defendant in this case may not be convicted of any offense charged by this indictment unless the offense was committed during the period of time between November 15, 1955 and June 1, 1959." The applicable statute of limitations is in Section 3282, Title 18, U.S.C., and provides that no person shall be prosecuted for any offense, not

capital, unless the indictment is found within five years next after the offense was committed. The court below, as we have indicated, correctly considered November 15, 1955 as the beginning of the five-year period preceding the handing down of the indictment on November 15, 1960. The payments made by Dorn to Provenzano and those made by Dorn Company to Communale were treated by the court below, under the theory advanced by the prosecution, as a continuous series of payments made as a result of the fears instilled in Dorn by Provenzano and Castellito in 1952 and 1953 which continued until June 1, 1959, when the last payment was made by the Company to Communale. In other words the "unit of prosecution" asserted by the Government was based on a single continuous plan of extortion the execution of which commenced in 1952 and which continued until June 1, 1959 when the last payment was made to Communale. The Hobbs Act, the Government asserts, defines the applicable unit of prosecution as the restraint upon commerce and not the causes of the restraint, citing Stirone v. United States, 361 U.S. 212, 215, 80 S.Ct. 270, 272, 4 L.Ed.2d 252 (1960). Provenzano seems to contend that each separate payment made by Dorn or by Dorn Company should have been alleged as completing a separate offense which should have been set up as an individual count in a multi-count indictment, each count requiring proof by the Government of every element of the Hobbs Act offense, including the instilling of fear of economic harm and the payment of money because of that fear. This position, if adhered to by this court or by the court below, would have rendered the indictment in the instant case inoperative and would have entitled Provenzano to a judgment of acquittal.

We cannot agree with Provenzano's argument. The evidence and the inferences to be drawn therefrom will sustain the conclusion hereinbefore set out as advanced by the Government that Provenzano and Castellito put Dorn in fear in 1952 and 1953 and caused him and

Dorn Company to make the payments to Provenzano and to Communale, the latter continuing until June 1, 1959. The payments were the consummation of the extortionate scheme which was a single and unified one. No pertinent issue as to limitation of the action is presented for the payments were carried well into the post limitation period. See United States v. Dierker, 164 F.Supp. 304, 305 (W.D.Pa.1958). As we have said, the Hobbs Act strikes at the burden on commerce, the extortionate payments which Dorn Company was compelled to bear. It was not necessary to decide whether the payments by Dorn as distinguished from those made by Dorn Company placed a burden on commerce for an examination of the court's charge on this phase of the case demonstrates its adequacy and fairness. The court charged the jury clearly that the payments relied on by the Government as extortive in support of the Hobbs Act charges were those made by Dorn Company to Communale.

 (B) An attack is made by Provenzano to the effect that there is no proof whatsoever in the record that he received any benefit, pecuniary or otherwise, direct or indirect, from the payments made by Dorn Company to Communale. Both the Government and Provenzano rely in large part upon the decision of the Supreme Court in United States v. Green, 350 U.S. 415, 76 S.Ct. 522, 100 L.Ed. 494 (1956). In United States v. Green, 135 F.Supp. 162, 164 (S.D.Ill.1955), the trial court held, granting a motion in arrest of judgment, that there was no "attempt to extort for the use of either the Union or the Defendant Green, any money or property of the contractor." The Supreme Court reversed the order in arrest of judgment, Mr. Justice Reed in interpreting the position of the District Court stated: "From its view that extortion as defined in the Hobbs Act covers only the taking of property from another for the extortioner's personal advantage, the necessity to arrest the judgment followed. * * * We do not agree with that interpretation of the section. The Hobbs Act was passed after this Court had construed § 2 of the Federal Anti-Racketeering Act of 1934, 48 Stat. 979, in United States v. Local 807, 315 U.S. 521, 62 S.Ct. 642, 86 L.Ed. 1004. Subsection (a) of § 2 barred, with respect to interstate commerce, exaction of valuable considerations by force, violence or coercion, 'not including, however, the payment of wages by a bona-fide employer to a bona-fide employee.' We held in Local 807 that this exception covered members of a city truck drivers' union offering superfluous services to drive arriving trucks to their city destination with intent, if the truck owners refused their offer, to exact the wages by violence. In the Hobbs Act, 60 Stat. 420, carried forward as 18 U.S.C. § 1951, which amended the Anti-Racketeering Act, the exclusion clause involved in the Local 807 decision was dropped. The legislative history makes clear that the new Act was meant to eliminate any grounds for future judicial conclusions that Congress did not intend to cover the employer-employee relationship. The words were defined to avoid any misunderstanding.

"Title II of the Hobbs Act provides that the provisions of the Act shall not affect the Clayton Act, §§ 6 and 20, 38 Stat. 731, 738, 15 U.S.C.A. § 17, 29 U.S.C.A. § 52; the Norris-LaGuardia Act, 47 Stat. 70, 29 U.S.C.A. § 101 et seq.; the Railway Labor Act, 44 Stat. 577, 45 U.S.C.A. § 151 et seq.; or the National Labor Relations Act, 49 Stat. 449, 29 U.S.C.A. § 151 et seq. There is nothing in any of those Acts, however, that indicates any protection for unions or their officials in attempts to get personal property through threats of force or violence. Those are not legitimate means for improving labor conditions. If the trial court intended by its references to the Norris-LaGuardia and Wagner Acts to indicate any such labor exception, which we doubt, it was in error. Apparently what the court meant is more clearly expressed by its statement * * * that the charged acts would be criminal only if they were used to obtain prop-

erty for the personal benefit of the union or its agent, in this case Green. This latter holding is also erroneous. The city truckers in the Local 807 case similarly were trying by force to get jobs and pay from the out-of-state truckers by threats and violence. The Hobbs Act was meant to stop just such conduct. And extortion as defined in the statute in no way depends upon having a direct benefit conferred on the person who obtains the property."

Provenzano argues that the Supreme Court did not say that a conviction could be sustained where there is no proof of any benefit whatever and insists that the Court was careful to say that no "direct" benefit was necessary and that this implies that at the very least an "indirect" benefit must be conferred. He goes on to argue that the Hobbs Act had its origin in the common-law crime of extortion as incorporated in the laws of New York and with this statement we have no disagreement. We so held in United States v. Nedley, 3 Cir., 255 F.2d 350 (1958) but we did not decide in the cited case the issue here presented as to whether or not it was necessary to show that the extortioner acted for his own benefit directly or indirectly. Moreover, the law of New York, if it be relied on, does not support Provenzano's position. Insofar as we are able to ascertain there is no statutory or common law of New York requiring that the extortioner benefit. The gravamen of the offense is loss to the victim. In People v. Fichtner, 281 App.Div. 159, 118 N.Y.S.2d 392 (1952), the defendants, clerks in a grocery store, extorted $25 from a customer, Smith, by threatening prosecution for shoplifting. In the cited case the court stated at p. 394: "It is not disputed that the $25 taken from Smith was 'rung up' on the store register; that the money went into the company funds and that defendants received no part of the money." The court went on to say: "Nor is defendants' good faith in thus enforcing payment of the money alleged to be due to their employer a defense." Id. at 396. The decision was unanimously affirmed by the Court of Appeals of New York, 305 N.Y. 864, 114 N.E.2d 212 (1953).

In People v. Scheppa, 295 N.Y. 359, 67 N.E.2d 581 (1946), rehearing denied, 296 N.Y. 855, 72 N.E.2d 34 (1947), the Court of Appeals of New York, without dissent, affirmed Scheppa's conviction for extortion. The jury had acquitted Calabria, Scheppa's co-defendant. The Court of Appeals of New York in reviewing the facts stated: "The money was later actually paid to Calabria, to be turned over to appellant, and there is no proof that Calabria did turn it over. But there was testimony from which the jury could find that Calabria was acting not as an agent for, or collaborator with, appellant, but as a friend of complainant, believing, however mistakenly, that discretion in compliance would serve complainant better than valor in resistance." 295 N.Y. at 361, 67 N.E.2d at 582.

As to the appellant's contention that there is no showing of benefit to anyone in the case at bar, it is apparent that the contention begs the question. Communale received substantial sums of money. It is not shown that he received them for Provenzano's benefit. But there is ample evidence from which the jury could infer that the so-called "retainer" was a mere fiction, a fraud, a palpable cover-up device for successful extortion. This issue was resolved by the jury against Provenzano and there is no basis upon which this court should or could reach a contrary conclusion.

In view of the foregoing authorities we hold that it is not necessary to prove that the extortioner himself, directly or indirectly, received the fruits of his extortion or any benefit therefrom. The Hobbs Act does not require such proof. It is enough that payments were made at the extortioner's direction to a person named by him.

■ (C) Provenzano asserts that there is insufficient evidence to prove beyond a reasonable doubt that the payments made by Dorn were made under compulsion induced by reasonable fear. He asserts that the law is "rather well

settled" that the fear which impels the surrender of property must be a "reasonable" one under all the circumstances, citing United States v. Tolub, 309 F. 2d 286, 288 (2 Cir. 1962). The rule adopted in Tolub is a fair one but what the appellant does on this point of his appeal is what he does under many other points, viz., quarrel with the evidence and with the jury's conclusions in respect thereto. There is ample evidence to sustain the conclusion that Provenzano, as the business agent for Local 560, held himself out to be in a position to slow down Dorn Company's business and did in fact do so. Dorn's fears in this respect were not unreasonable but were reasonable. The continuation of the conduct of the truckers at the Secaucus terminal could have reduced Dorn Company to relative impotency.

But Provenzano makes a further point. He asserts that it is necessary that the Government prove by additional or supplemental proof that Dorn's fears, even assuming them to be reasonable, instilled in him in the period barred by the statute of limitations, were reinstilled in him during the period not barred by acts committed within the latter period, or at least that Dorn's fears originating in the pre-limitation period were retained by him in the period not barred by the statute. In our view this argument overstates the applicable test. If Dorn's payments of money to Provenzano in the pre-limitation period were reasonably impelled by fear, the jury was entitled to infer that the payments made by Dorn Company to Communale within the period not barred by the statute of limitations were also and similarly impelled by Dorn's fears and that Provenzano thereby imposed a burden on Dorn Company and interstate commerce.

It must be conceded, however, that Provenzano's counsel here makes an ingenious and original argument. It is as follows: The payments to Communale made by Dorn Company were made monthly without the interposition of a signature by an officer of Dorn Company and by the use of a machine called a "Checkwriter". Dorn Company's bookkeeper and accountant, Lindquist, testified that where either weekly or monthly charges of "less than a thousand dollars a month were involved," such as those with which we are concerned in the case at bar, "instructions were given to a disbursement clerk which became [an] automatic procedure of issuance" and that the "checks were typed out" and that then "they go through a checkwriter". The checks, Lindquist testified, were put into the checkwriting machine "which signs the authorized signatures". But the fact remains that someone, perhaps Dorn, ordered Communale's name put on the necessary list and that it continued on that list until Dorn or some other person ordered it taken off sometime in the first half of the year 1959. Provenzano's argument seems to imply that a checkwriting machine has an animus of its own. We cannot accept this argument, ingenious as it is. It implies that Dorn was unaware of the fact that Dorn Company had assumed the obligation which he had undertaken in the first instance. This issue was one for resolution by the jury and the jury must be assumed to have found against Provenzano in respect to it. The facts respecting the payments made by Dorn and Dorn Company were fully before the jury. The triers of the fact were entitled to draw their own conclusions as to why the payments made to Communale were made and continued to be made. There was no error here.

(D) There is one point which arises in respect to the payments made by Dorn to Provenzano and by Dorn Company to Communale which requires extended consideration. Dorn on cross-examination in respect to his dealings with Provenzano, was asked in substance whether or not it was true that Provenzano never made any demand for money for himself personally or any request for any money. Dorn answered "No" to this question. Dorn was then asked, "Did he [Provenzano] ask you for a gift?" Dorn replied, "No". He was then asked, "Gift of anything?", and he

again replied, "No". He was finally asked the following question: "So that any arrangement that you had to pay him [Provenzano] money ended when you said you wouldn't pay it any more in 1954,[5] isn't that right?" Counsel for the United States objected. The objection was sustained and Provenzano's counsel thereupon took an exception.

No ground for the objection was stated by counsel and the court below did not divulge the basis of its ruling. It must be borne in mind that extensive evidence was put into the record by the United States about Dorn's payments to Provenzano in the pre-limitation period and Dorn Company's payments to Communale in the post-limitation period. Provenzano's counsel objected strenuously and unsuccessfully to much of the evidence which was presented to the jury. We are of the opinion that the trial court did not err in admitting it. It was the theory of the Government that the payments made by Dorn Company to Communale were merely a continuation under another guise but for the same purpose, i. e., to secure industrial peace at the Secaucus terminal, as were the payments made by Dorn to Provenzano himself. If Provenzano could break this continuum by showing that it was terminated prior to the time payments began to be made by Dorn Company to Communale it would have been necessary for the United States to prove that Provenzano had instilled fear into Dorn Company which had caused that Company to make the payments to Communale.[6] In such an event, the Government's theory of a continuum of fear beginning in 1952 and terminating in June 1959 would have been impaired. Provenzano would have been able to argue, if Dorn had stated that the "arrangement" had been terminated, that

there was no showing of any threat or demand in the post-limitation period.

Our inquiry then must be whether the question was a proper one. The "arrangement" referred to by Provenzano's counsel was really a contract, however illegal and contrary to public policy it may have been. In substance it was an agreement entered into by Dorn with Provenzano, seemingly in conjunction with Castellito, that in consideration of the payments to be made, the labor troubles that were impeding the Company's business, interstate in nature, would cease. What Provenzano's counsel was calling for in his question which was objected to was an opinion by Dorn, a layman, as to whether or not a contract had been brought to an end. The question therefore called for a legal conclusion which lay within the province of the court. It follows that the question was an improper one and the court below did not commit error in refusing to permit Dorn to answer it.[7]

■ What we have said indicates, we think, that Provenzano had the right on cross-examination of the Government's witnesses or by testimony offered on his own behalf, to inquire into all pertinent circumstances relating to his transactions with Dorn or Dorn Company or with anyone connected with them. The particular question in issue here, could itself have been asked a second time in a less conclusionary and ambiguous fashion. We note, however, that Provenzano's counsel did not attempt to do so, apparently considering further inquiry on the point not worthwhile. We are of the opinion that he was permitted to ask the witness all proper questions without intervention by the trial judge. The relevant facts relating to the circumstances respecting Dorn's payment

5. As will appear from an examination of the record, Dorn testified that on some occasion late in 1953 or early in 1954 he told Provenzano that he, Dorn, could no longer make the payments to Provenzano. Compare the date of the retainer letter in note 2 supra.

6. See the discussion under heading "C" supra.

7. We need not discuss the point that the question was also vague and argumentative and as such improper.

to Provenzano and Dorn Company's payment to Communale were brought out. Provenzano's counsel had every opportunity to avail himself of the benefits of proper cross-examination and to the extent he deemed it desirable, did in fact do so. We perceive no error here.

(E) The court below, without any request by the Government insofar as we can ascertain from the record, gave an instruction to the jury that Provenzano might be found guilty of aiding and abetting the commission of the crime charged in the indictment. The court first read the substance of the provisions of 18 U.S.C. § 2, with certain immaterial omissions, to the jury, stating as follows: "Whoever commits an offense against the United States or aids, abets or procures its commission is punishable as a principal. Whoever wilfully causes an act to be done which if directly performed by him would be an offense against the United States is punishable as a principal." The trial judge went on to say: "The guilt of a defendant may be established without proof that he personally did every act constituting the offense charged. Any person who participates in the commission of an offense with knowledge of its commission is a principal and subject to prosecution. This rule, however, does not apply to one who without knowledge of the commission of an offense innocently or inadvertently aids or assists in its perpetration. This rule may become particularly significant here depending of course on the view of the testimony and the documentary evidence. In order to aid and abet another to commit a crime it is necessary for the defendant wilfully to associate himself in some way with the criminal venture and that he wilfully participate in it as in something he wishes to bring about, and that he wilfully seek by some action of his to make it succeed. One who aids and abets, counsels, commands, induces or procures the commission of an act is as responsible for that act as if he committed it directly. In order to aid and abet another to commit a crime it is necessary, as I indicated, that the defendant in some way associate himself with the venture."

At the close of the charge Provenzano's counsel objected *inter alia* to that portion of it which dealt with aiding and abetting. Provenzano's counsel stated: "I except to so much of your Honor's charge—something that was not in the indictment, not mentioned—and that was this, that portion of your charge with regard to aiding and abetting wherein your Honor said that guilt may be established without direct proof of knowledge of the crime on the defendant, in connection with this aiding and abetting, and I except specifically to your Honor's statement to the jury that—according to your Honor's description of aiding and abetting you said that all that was required was—and here I think I have the exact words—'that the defendant associate himself in some way' with the crime. Certainly it would not be the law with regard to this question of aiding and abetting, and I respectfully except to your Honor's charge particularly on the question of intent and the meaning of it and what people reasonably consider the function and end results of their acts as being limited solely to the defendant Provenzano and not including Dorn or any of the other witnesses in the case, and I particularly except to your Honor's statement that fear of injury, financial injury—"

Later Provenzano's co-counsel made a further and a different objection, stating: "Just one observation, it is my opinion, your Honor—I known Mr. Singer [Provenzano's chief counsel] has objected to your Honor's charge on the theory of aider and abettor. It is my opinion he could not aid somebody who was not charged as a principal, and I see no mention as to Communale being charged as a principal or anyone else, so no one can aid and abet someone who is not [so] charged."

After a side bar conference the court then said to the jury: "Ladies and gentlemen of the jury, while I think I have covered this, I am going to repeat again to you instructions with reference

to the offense of aiding and abetting. One who aids and abets, counsels, commands, induces or procures the commission of an act is as responsible for that act as if he committed it directly. In order to aid and abet another to commit a crime it is necessary to show that a defendant in some way associated himself with the venture, that he participated in it as something what [sic] he wishes to bring about, that he seeks by his action to make it succeed."

The jury then retired to consider its verdict and after the retirement of the jury Provenzano's co-counsel stated: "I want the record to reflect that we object to your Honor again charging on aiding and abetting, that is in the light of the fact that your Honor didn't change it to any extent."

The Court replied: "Mr. Singer mentioned that I stopped when I merely related that he must be associated with a criminal venture. I felt that Mr. Singer was in error, but in view of the fact that he raised the question I thought in the interests of further precaution that I would accept what he told me and I charged accordingly, but your exception —your further exception is noted upon the record."

On this appeal Provenzano urges that the court erred in submitting to the jury the instruction on aiding and abetting. The sole ground relied upon for this contention is in his words "that there was no proof whatever that Communale was a principal in the crime or that there was any collaboration between Communale and defendant." At the trial and before the case was submitted to the jury, Provenzano's counsel directed the court's attention to approximately one hundred alleged defects in the charge. A careful scrutiny of the exceptions relating to the aiding and abetting instruction which are set out in the immediately preceding paragraphs, makes evident that the particular ground of objection urged here

was not brought to the attention of the court.

■ It is of course fundamental that as a general rule the failure to object to an instruction during a criminal prosecution on the ground urged on appeal, forecloses the party from raising the question before the reviewing court. See, e. g., Johnson v. United States, 291 F.2d 150 (8 Cir.), certiorari denied, 368 U.S. 880, 82 S.Ct. 130, 7 L.Ed.2d 80 (1961). Rule 30 of the Federal Rules of Criminal Procedure provides in pertinent part: "No party may assign as error any portion of the charge or omission therefrom unless he objects thereto before the jury retires to consider its verdict, stating distinctly the matter to which he objects and the grounds of his objection." The manifest purpose of the rule is to avoid whenever possible the necessity of a time-consuming new trial by providing the trial judge with an opportunity to correct any mistakes in the charge. See Palmer v. United States, 229 F.2d 861 (10 Cir.), certiorari denied, 350 U.S. 996, 76 S.Ct. 546, 100 L.Ed. 861 (1956).

■ By virtue of general law and Rule 52(b) of the Federal Rules of Criminal Procedure,[8] this court has the power to consider sua sponte errors affecting substantial rights in cases where no objection was taken. Our discretionary power in this regard must be viewed in light of Rule 30 and in no event can be exercised except in situations where the error is such as to involve a manifest miscarriage of justice. See United States v. Vasen, 222 F.2d 3 (7 Cir.), certiorari denied, 350 U.S. 834, 76 S.Ct. 70, 100 L.Ed. 744 (1955). Conceding that it may have been unnecessary for the court to charge that Provenzano might be convicted as an aider and abettor within the meaning of Section 2, 18 U.S.C., we conclude that any error in this regard with respect to Provenzano's relationship to Communale, was neither plain nor af-

8. Rule 52(b) provides: "Plain Error. Plain errors or defects affecting substantial rights may be noticed although they

were not brought to the attention of the court."

fected substantial rights within the purview of Rule 52(b). See and compare United States v. Lurie, 222 F.2d 11, 16 (7 Cir.), certiorari denied, 350 U.S. 835, 76 S.Ct. 71, 100 L.Ed. 745 (1955).

The general rule is that in order to convict a defendant of aiding and abetting the commission of a substantive offense, the proof must establish that the crime in question was committed by someone and that the person charged as an aider and abettor, aided and abetted in its commission. Von Patzoll v. United States, 163 F.2d 216 (10 Cir.), certiorari denied, 332 U.S. 809, 68 S.Ct. 110, 92 L.Ed. 386 (1947). It is not prerequisite to the conviction of the aider and abettor that the principal be tried and convicted or in fact even be identified. See Gray v. United States, 260 F.2d 483 (D.C.Cir. 1958). Each participant in an illegal venture is required to "stand on his own two feet." United States v. Klass, 166 F.2d 373, 380 (3 Cir. 1948). An individual may be indicted for commission of a substantive crime and convicted by proof showing him to be an aider and abettor. See United States v. J. R. Watkins Co., 127 F.Supp. 97, 101 (D.Minn.1954). See also United States v. Washington, 287 F.2d 819 (7 Cir.), certiorari denied, 366 U.S. 969, 81 S.Ct. 1933, 6 L.Ed.2d 1259 (1961); United States v. Krepper, 159 F.2d 958, 970–971 (3 Cir. 1946), certiorari denied, 330 U.S. 824, 67 S.Ct. 865, 91 L.Ed. 1275 (1947).

The offense contemplated by Section 1951, 18 U.S.C., in question here, is composed of multiple elements, e. g., demand, imposition of fear, and payment and interference with commerce. Where more than one actor is involved in an alleged violation of this section, all contributing in varying degrees to the success of the operation,[9] the distinction between principal actors and aiders and abettors in the enterprise is somewhat illusory.[10] The present case typifies just such a situation. Counsel for Provenzano made no request for a more detailed charge on aiding and abetting and without such a request, the court was not obligated to instruct the jury further on the point.[11] See Guon v. United States, 285 F.2d 140, 142 (8 Cir. 1960).

9. The Hobbs Act prior to the present revision contained its own aiding and abetting provision. 60 Stat. 420 (1946) provided as follows: "SEC. 1. As used in this title— * * * (c) The term 'extortion' means the obtaining of property from another, with his consent, induced by wrongful use of actual or threatened force, violence, or fear, or under color of official right.

"SEC. 2. Whoever in any way or degree obstructs, delays, or affects commerce, or the movement of any article or commodity in commerce, by robbery or extortion, shall be guilty of a felony.

"SEC. 3. Whoever conspires with another or with others, or acts in concert with another or with others to do anything in violation of section 2 shall be guilty of a felony.

"SEC. 4. Whoever attempts or participates in an attempt to do anything in violation of section 2 shall be guilty of a felony.

"SEC. 5. Whoever commits or threatens physical violence to any person or property in furtherance of a plan or purpose to do anything in violation of section 2 shall be guilty of a felony.

Footnote 9—continued:

"SEC. 6. Whoever violates any section of this title shall, upon conviction thereof, be punished by imprisonment for not more than twenty years or by a fine of not more than $10,000, or both."

The reviser's notes to Section 1951, 18 U.S.C., states: "The words 'attempts or conspires so to do' were substituted for sections 3 and 4 of the 1946 act, omitting as unnecessary the words 'participates in an attempt' and the words 'or acts in concert with another or with others', in view of section 2 of this title which makes any person who participates in an unlawful enterprise or aids or assists the principal offender, or does anything towards the accomplishment of the crime, a principal himself."

10. It was perhaps for this reason that the Hobbs Act prior to the present revision made specific provision for aiders and abettors. See note 9 supra. No distinction is of course drawn under either version of the statute with respect to punishment of principal actors and aiders and abettors.

11. In Nye & Nissen v. United States, 336 U.S. 613, 619, 69 S.Ct. 766, 769, 93 L.Ed.

In the instant case the evidence established Provenzano's essential participation in a scheme to mulct Dorn Company. There was sufficient evidence to connect Communale as well as Castellito with Provenzano in a violation of section 1951. Compare Nye & Nissen v. United States, 336 U.S. 613, 619–620, 69 S.Ct. 766, 769, 770, 93 L.Ed. 919 (1949). We need not reiterate the relevant testimony which is set out in some detail under heading "I" of this opinion. The jury was entitled to draw any reasonable inference from the evidence in favor of the United States and against Provenzano. It is sufficient to state that the evidence indicated that Castellito participated in the imposition of the original demand commencing the extortion, and it was a reasonable inference that Castellito was also implicated with respect to the initiation of the payments to Communale. The evidence demonstrated that Communale participated in the collection of payments consummating the extortionate scheme. The jury could have found that Provenzano aided and abetted either or both Communale and Castellito in a collaboration during which each performed some essential act. Compare Meredith v. United States, 238 F.2d 535, 541–542 (4 Cir. 1956).

In view of the foregoing it is difficult to see how Provenzano could have suffered any prejudice whatever with respect to the objection to the aiding and abetting charge raised on this appeal. In any event in our view it is clear that the question is not one which even remotely suggests the possibility of a miscarriage of justice.

(F) The position of Provenzano in respect to what must be shown to prove him guilty and what he asserts was demonstrated by the proof is far from clear. Provenzano seems to insist that there was no proof that his acts constituted any interference with interstate commerce. The court charged in part on this aspect of the case as follows: "The inducement by fear of payment of money out of the funds of a business for unnecessary, fictitious services, constitutes extortion as defined by the statute, even though * * * the one who caused such payments of money to be made did not directly or indirectly receive any part of the money which was paid.

"If you find from the evidence that money was obtained from Dorn's Transportation, Inc., by way of extortion during the period from November 15, 1955 to and including June 1, 1959, at the instance of the defendant you may infer from that fact that payments of money made did in some way or degree obstruct or delay or affect the business in which Dorn's Transportation Inc., was engaged. Where the resources of a business are depleted or diminished in any manner or degree by payments of money obtained by extortion the capacity to efficiently conduct such business is to the extent of the drain on its resources likely to be impaired. The specific amount of such money obtained by extortion or the precise manner or degree to which it had an effect on the business is of no consequence. It is merely required by the law where extortion is shown that it did in some way or degree obstruct, delay or affect commerce. The pertinent language of the statute which I will now repeat here again is as follows: 'Whoever, in any way or degree obstructs, delays, or affects commerce or the movement of any article or commodity in commerce by extortion shall be punished' in the manner prescribed by the statute."

At a later point the court charged the jury on this point in pertinent part as follows: "As I stated to you earlier in my charge, you may infer if extortion is established that it did in some way or

919 (1949), the Supreme Court said, quoting Judge Learned Hand in United States v. Peoni, 100 F.2d 401, 402 (2 Cir. 1938): "In order to aid and abet another to commit a crime it is necessary that a defendant 'in some sort associate himself with the venture, that he participate in it as in something that he wishes to bring about, that he seek by his action to make it succeed.'" The court's charge was in almost literal compliance with this test.

degree obstruct or delay or affect commerce, and in connection with this it is not necessary for you to find from any of the evidence submitted with respect to the congestion that any particular shipment of freight moving in or out of the Secaucus yards was obstructed or delayed. It is the depletion of the resources of a business by extortion which permits as a reasonable inference if the extortion is established that its operations are delayed, obstructed, affected. 'Affected' as used in the statute is spelled a-f-f-e-c-t-e-d."

The substance of Provenzano's objection was that the mere payment of money, asserted by him to be but one of the elements of extortion, composed of threats of violence, fear and payment, could not, as the court in this case charged, constitute a sufficient interference with commerce to come within the purview of the Hobbs Act. But in Stirone v. United States, 361 U.S. 212, 215, 80 S.Ct. 270, 272, 4 L.Ed.2d 252 (1960), the Supreme Court respecting the intent of Congress in passing the Hobbs Act, stated: "That Act speaks in broad language, manifesting a purpose to use all the constitutional power Congress has to punish interference with interstate commerce by extortion, robbery or physical violence. The Act outlaws such interference 'in any way or degree.' 18 U.S.C. § 1951(a). Had Rider's business been hindered or destroyed, interstate movements of sand to him would have slackened or stopped. The trial jury was entitled to find that commerce was saved from such a blockage by Rider's compliance with Stirone's coercive and illegal demands. It was to free commerce from such destructive burdens that the Hobbs Act was passed. United States v. Green, 350 U.S. 415, 420, 76 S.Ct. 522, 525, 100 L.Ed. 494." There are two basic elements in a Hobbs Act crime: interference with interstate commerce and extortion. Both were set out

in the indictment and both were proved in the case at bar. We can perceive no reason why extortive payments, in substantial amounts, paid as here from the treasury of a company engaged in interstate commerce in order to avoid obstruction of the company's interstate business should not be deemed to affect commerce and therefore to lie within the proscription of the Hobbs Act. Compare Bianchi v. United States, 219 F.2d 182, 189–191 (8 Cir. 1955), certiorari denied, 349 U.S. 915, 75 S.Ct. 604, 99 L.Ed. 1249 (1955). This was the substance of the court's charge. We hold it to have been a correct one in the light of all the circumstances.

(G) The next issue which we must discuss requires its own statement of facts. The case was finally moved for trial on Thursday, May 23, 1963.[12] On that day the Government asked that the jury be sequestered in order to protect the "integrity" of the case and the position of the defendant whose "misguided" friends "may seek to do things in the course of a trial which would only be to his detriment, but over which he would have no control". The court reserved decision on the motion. A jury was empaneled and was sworn immediately thereafter. The trial started on May 23, 1963 with arguments on certain motions and with the Government's opening statement. No testimony was taken on that day. The trial was scheduled to continue on Friday, May 24, 1963, and did in fact do so, although under somewhat extraordinary circumstances. It appears that on that morning at some hour not shown in the record, Walter Glockner, the shop steward of Dorn Company, a member of Local 560 and a "potential witness" for the United States, was shot to death in front of his home. There is nothing in the record which tends to show accurately the hour of the shooting.[13] But it appears that on Friday, May 24, after hearing

---

12. The circumstances of the delays are not relevant here.

13. The Government states in its brief that Glockner was shot between 6 and 6:30

A.M. on May 24, 1963, and Provenzano's brief makes a similar statement. We have stated repeatedly that we cannot accept statements made in briefs as evidence.

one witness, Lindquist, the office manager and assistant secretary of Dorn Company, at about 12:15 P.M., the court excused the jury until 2 P.M., saying that at that time "[W]e will return and we will continue on this case. The marshal will give you further instructions with respect to the recess, but you are to return here at 2 P.M." The jurors were not permitted to leave the courthouse for lunch and were cut off from outside sources of information during the recess.

At side bar at the beginning of the afternoon session, on Friday, May 24, Assistant United States Attorney Boylan stated to the court: "As I indicated earlier there was an incident this morning in which Mr. Walter Glockner, a shop steward at Dorn Transportation terminal and a member of Local 560, was shot." [14] Mr. Boylan went on to say: "[W]e have been besieged by the press with respect to Mr. Glockner's participation, if any, in this trial. * * * We have declined to give any comment at all." He said that if Provenzano was to be given a fair trial the jury had to be insulated from "any version whatever" of the shooting and that the members of the jury should be "locked up". The court then called upon Provenzano's principal attorney, Mr. Singer, who told the court that he did not see "how anybody could insulate the jurors from any situation like that. It is a practical and physical impossibility even if you locked them in the jury room in this courthouse." He went on to say: "No great harm would come to anyone if I moved for a mistrial and you consented, because as you said, we couldn't get a fair trial in this atmosphere and we delayed it [the trial] until fall." There was further colloquy which need not be set out here and the court received and read a newspaper account of the shooting. The trial judge then said: "I have given further consideration to the Government's motion to sequester this jury and I have to consider all of the circumstances in connection

with that as it may relate to a trial, a fair trial in this case by the jury. I have reached the conclusion that the jurors should be sequestered. In fact the jury has been at the order of the Court sequestered since our last recess. They have had lunch in the jury room. They will be sequestered for the remainder of this trial and the trial will now continue on every weekday and holiday with the exception of Sunday until it is concluded. * * * I now instruct the marshal to arrange for accommodations for the jurors, to advise them of the order of sequestration and to obtain from them a list of the things that they need and to bring those things from their homes to Newark. * * *"

Mr. Singer then moved for a mistrial on the ground that the court's action in sequestering the jury under the circumstances indicated was so prejudicial as to deprive the defendant of all possibility of a fair trial. He stated: "I point out. * * * that at this point we don't know whether the jurors ever heard of this particular incident before they arrived at the courthouse this morning. I have no knowledge when the incident occurred and I think that under these circumstances your Honor's sequestration of the jury would in essence be ascribing to this defendant some responsibility for this act which is the cause of the discussion, and I think it would be unfair and unjust under these circumstances to compel him to further continue on trial."

The court then denied Provenzano's motion for a mistrial. The jury was called back into court and was informed by the court that arrangements were being completed for sequestration and the jury was excused with the instruction that its members should return at 10 a. m. the following morning.

Upon the morning of the following day, Saturday, May 25, 1963, immediately upon the convening of court, the jury being absent, Provenzano's chief counsel, Mr. Singer, apparently presented mo-

14. A search of the record does not indicate when or how Mr. Boylan gave the "earli- er" indication respecting Glockner's shooting.

tions relating to the sequestration of the jury.[15] The court informed him that it would rule upon these motions later in the day and the hearing of witnesses was proceeded with, of course in the presence of the jury. We find no place in the transcript of the proceedings at the trial where the court ruled expressly on these three written motions of May 25, 1963 or at any time thereafter, though portions of them were made orally subsequently and the motion for a separate examination of the jurors was included as a ground in Provenzano's written motion for arrest of judgment and for a new trial. All portions of the motions

---

15. We use the word "apparently" advisedly for the "motions" which the typewritten transcript indicates were handed up to the court on the morning of Saturday, May 25, as a separate document or documents, are not shown among the docketed papers as having been received at this time. It does appear, however, as is set out at a later point in this opinion, that the motions were received and docketed on July 12, 1963, at 2:25 P.M., some days after the jury had rendered its verdict, had been discharged, and Provenzano had been sentenced. The motions are entitled "Defendant's Additional Requests to Charge" and are set out in the appellant's appendix. They are as follows:

(Title Omitted)

"Without Waiver of Prior Motions for a Mistrial Made Because of the Court's Order to Sequester the Jury, It is Respectfully Requested that the Court Charge the Jury as Follows:

"1. That the fact that the jury is being held together and not permitted to go home during this trial is not because of any act or statement of Mr. Provenzano or his attorneys.

"2. That the act of holding the jury together should not in any way cause a juror to give this cause any special treatment or importance, this case is to be tried and judged just as all other cases are judged.

"3. During the sequestration of the jury, no juror shall be permitted to listen to any radio or television broadcast and that access to a radio or television set is barred to them.

"4. No juror is permitted to read any newspaper or magazine or news publication of any kind. (Explanation) This last request is made because the removal of portion of a newspaper or magazine which has any items involving this case creates suspicion and engenders prejudice.

"5. The jury is informed that the application to sequester them was made by the Government and was granted by the Court over the opposition of the defendant.

"Motion for Mistrial on the Ground of Prejudice

"It now appears quite affirmatively that speculation is rife that the attack on or shooting of the individual mentioned by the Asst. United States Attorney in the side bar discussion has been attributed to the defendant, Anthony Provenzano. Radio and television broadcasts, as well as newspaper articles blazon forth—with a constant stream of prejudicial matter charging responsibility for this shooting to Anthony Provenzano. It is impossible, no matter how the jury be sequestered, to keep from the jurors this openly broadcast and widely spread matter.

"Under these circumstances, the defendant respectfully moves for the declaration of a mistrial, and after such mistrial for a reasonable adjournment of the trial of the matters under this indictment until such time as the publicity attendant to this very incident shall have died down.

"This motion is made in written form in order to avoid the possibility that the ground of the application become available to the newspapers or other news media.

"Motion to Have Court Make Private Inquiry of Each Juror.

"At this time the defendant, Anthony Provenzano, respectfully asks that each juror be separately questioned in a private place away from the other jurors; that such questioning be done by the Court in the presence of the United States Attorney and the Attorneys for the defendant; the Court is requested to ask each juror whether (a) he has heard, seen or read anything about the Teamsters' Union, Mr. Provenzano or the Dorn Transportation Co., or any of its employees since the commencement of the trial.

"(b) What it was each juror heard, saw or read concerning the matters referred to in 'a'.

"(c) What effect the reading, seeing or hearing of such matter had on the juror.

"(d) Whether the fact that the jury was sequestered will have any effect on his ultimate judgment.

"Explanatory Note

"The inquiries under 'a' refer of course to matters of those concerning which testimony was given in open Court."

made orally were denied. We find no place in the transcript where the three written motions were offered again to the court and the document or documents do not appear among the original papers transmitted to this court under our Rule 16(1).[16] We conclude as a matter of fairness that the three written motions should be considered by this court as if they were before the court below on May 25 and were considered then by that court for the first time. This will require us to discuss again some of the aspects of the subjects set out in the motions at other points in this opinion as will hereinafter appear.

Assuming, therefore, that the grounds for a mistrial handed up by Provenzano's counsel to the court on Saturday, May 25, 1963, were as set out in footnote 15 supra, upon consideration we find them to be without merit. Request (1) of the first motion, if granted, might immediately have prejudiced the Government's case since it is conceivable that jurors, even though they are men sworn to do their duty in an official capacity, nonetheless might entertain some hostility against a person or persons who caused them prolonged confinement. The second request was equally ill-advised. To instruct a jury that a case is not to be given "any special treatment" or awarded special "importance" would serve to heighten undesirable speculation respecting the importance of the case rather than to quiet it. Grounds (3) and (4) were substantially complied with by the court below, though somewhat modified as we shall see hereinafter. Ground (5) clearly would have been prejudicial to the United States, a party to the suit as much entitled to a fair trial as was Provenzano.

The second motion was for a mistrial on the ground of prejudice. It may be that the killing of Glockner received wide publicity in connection with Provenzano and his trial. But to say that sequestration of the jury could not possibly have the effect of keeping that story from the jurors, is to engage in manifest speculation. Implicit in our discussion on this aspect of the case, is the view that the precautionary measures taken by the court below were sufficient to render insubstantial any question concerning the possibility that the jurors read or heard any matter likely to be prejudicial to Provenzano before the end of the trial. The second motion was without merit.

The third motion, that to have the court make a private inquiry of each juror and ask him or her the questions set out in the motion, if employed as a method of investigation during the course of the trial, might well have built up such an atmosphere of suspicion about Provenzano and his relations to Dorn Company and the Teamsters' Union as to render a fair trial for Provenzano almost impossible. The facts and circumstances of this case make it sufficiently clear that the court below did not abuse its discretion in refusing to grant this motion [17] at the time or times when apparently it was offered.

On the morning of May 27, 1963, before the jury returned to the court room,

16. Rule 16(1) of this court provides: "Original Papers to Constitute Record on Appeal. Appeals from the district courts * * * in all cases, civil and criminal, * * * shall be heard on the original papers, which papers shall constitute the record on appeal."

17. There is no evidence in the record and nothing was offered to the court below showing that newspapers and broadcasts reported the Glockner affair, let alone intimated that Provenzano might be involved, *prior* to the time that the jurors were cut off from outside sources of information. Particularly in view of counsel's persistence in pursuing his objections in regard to this aspect of the case, it is not unreasonable to assume that if positive evidence to this effect had in fact existed, it would have been brought forward for consideration by the court. In stating the foregoing we are not unaware that Provenzano's counsel offered the front page of the Newark Evening News of Friday, May 24, 1963 at about 2:00 P.M. on that day to the Judge for his perusal. We cannot find this document in the record and counsel for Provenzano has not reproduced it in his appendix or made any

the trial judge stated that he had decided to relax some of the restrictions he had theretofore imposed in sequestering the jury. He stated: "To a limited extent and under censorship the jurors will be permitted to see some television programs and to see some newspapers. The television programs will be monitored. The newspapers will be screened so that in connection with television programs or newspapers nothing will come to the jury which could possibly create any impression from an outside source with respect to the issues here, the testimony or any other developments. I want to bring that to the attention of counsel. Also I might add generally a program has been developed which will afford the jurors the maximum convenience, both in the way of recreation when they are out of the court and in other respects appropriate [sic] consistent with the objective of insulating them from any information that would in any way be prejudicial either to the Government or the defendant in this case, and appropriate instructions have been issued to the marshal in connection with this."

▮ Provenzano's counsel then and on several later occasions during the trial requested that the court put on record the instructions which it had given the marshal respecting the sequestration of the jury. These requests were rejected by the court. As we view the record the instructions of the court to the marshal as to the matters which the jury might be permitted to read or hear appear with sufficient clarity from the typewritten transcript itself. There was no error or prejudice here.

Provenzano's counsel on the morning of May 27 next urged again the granting of the "written application made on Saturday morning [May 25] with regard to interrogating each juror in private", the third motion set out in note 15 supra, and also urged that the jury be permitted to see no television programs and that reading any newspapers with portions clipped therefrom would be prejudicial. The court denied this oral motion. Provenzano's counsel also asked again that the jurors be interrogated individually as to what they had heard outside of the court room respecting Provenzano and the trial. This oral motion was also denied. The court pointed out that the jury had been sequestered on the morning of the Glockner shooting and had been cut off "from every outside source of information". The court then called the jury back to the court room and explained in general terms the necessity for the restrictions which had been imposed on them.

▮ Another oral motion for examination of the jurors separately was made at the close of the Government's case, when Provenzano moved for a judgment of acquittal, pursuant to Rule 29, Fed.R. Crim.Proc., 18 U.S.C.

We find no error in what the trial judge did and said in respect to these matters on the occasions related.

In his motion for an arrest of judgment and for a new trial, Provenzano cited for his fourteenth ground the following: "The Court erred in denying the applications (handwritten and typewritten) submitted in writing with respect to the interrogation of the jurors before they were sequestered * * * and which applications were renewed a number of times during the trial. * * * A request was then renewed specifically for the direct interrogation of each juror by the Court * * *,[18] and the Court

---

contentions with respect to it or based on it on this appeal.

It is also worthy of note that during his summation to the jury, Mr. Singer said the following: "Do you know anything about Provenzano that is not on the record, that you have not heard here in the courtroom or seen here in the courtroom? Any one of you? Do you know anything about this case that you have

not heard or seen here in the courtroom?" The Government asserts in its brief on this appeal, that these questions were asked "slowly and deliberately to the jury." Whatever the manner of the questioning, no juror responded.

18. This was an apparent attempt of incorporation by reference of the motions set out in note 15 supra.

erred in denying the motion to interrogate or to instruct the jurors as requested. The denial of the motion for a mistrial made in connection with the request for such interrogation and the sequestration of the jurors was error." As we ruled previously no error was committed by the court below in denying the motion for a mistrial. We further state that no error was committed by the court below in denying Provenzano's motion for an arrest of judgment and for a new trial. Finally, the issue of whether or not Provenzano was prejudiced by the court's refusal to declare a mistrial or to allow an examination of the jurors separately was attempted to be brought up for the last time by the same document set out in note 15 supra, entitled as we have said, "Defendant's Additional Requests to Charge". It should be noted at this juncture that the motion is stated in the present tense as if the jury were sitting and the trial was in progress and is phrased, as we have already pointed out, as if to cause the trial judge to sequester the jury and to have him state to the jury the reasons for their sequestration and that that sequestration was at the request of the Government and not because of any act of Provenzano. The so-called request for charge also contains a motion for a mistrial and this is based on a recapitulation of some of the reasons set forth in the motions referred to in note 15 supra.

██ This paper was filed on July 12, 1963, at 2:25 P.M. The jury had brought in its verdict and had been discharged with the thanks of the court some days earlier. The jury *qua* jury no longer existed and its individual members had returned to their homes. What is as extraordinary are the facts that Provenzano had been sentenced on the same day at 11:45 A.M. and had taken an appeal to this court five minutes later, at 11:50 A.M. The court below was without power to receive the paper since it no longer had jurisdiction of the cause.

The trial was a comparatively long one and the record is far from scanty. Not only the appendices but the whole transcript has been examined with care. Other points have been raised by Provenzano but we are of the opinion that they do not require discussion. We find no prejudicial error.

The judgment of conviction will be affirmed.