**UNITED STATES of America**
**v.**
**Richard Laverne BREWER.**
**Crim. A. No. 73-197.**

United States District Court,
W. D. Pennsylvania.

March 26, 1974.

Richard L. Thornburgh, U. S. Atty., Pittsburgh, Pa., for plaintiff.

Richard J. Catalano, Pittsburgh, Pa., for defendant.

## OPINION AND DECREE

SNYDER, District Judge.

The Defendant, Richard Laverne Brewer, was found guilty on September 13, 1973, after a jury trial, of causing to be transported in interstate commerce an American Express Company Money Order payable to one Emma Cylesta and endorsed by him as "Edwin G. Meyers",

in violation of 18 U.S.C. § 2314.[1] Defendant's Counsel filed a Motion for New Trial setting forth that the Court erred in denying Defendant's Motion for Acquittal at the conclusion of the Government's evidence, and that the verdict was contrary to the weight of the evidence and not supported by substantial evidence. Subsequent to the presentation of the Motion, Trial Counsel, Carl Max Janavitz, filed a Motion for Withdrawal of Appearance indicating a disagreement between Counsel and the Defendant with respect to the advisability of proceeding with the Appeal, and of Counsel's inability to receive communications from the Defendant. The Defendant had informed Counsel that he would seek to have other counsel appointed to represent him and that he was unable to advance the costs needed for the preparation of the transcript which was required for the argument on the Motion for New Trial.

On October 26, 1973, Mr. Janavitz was given leave to withdraw his appearance when the Defendant appeared in Court and concurred in the withdrawal and asked the Court to appoint counsel for him as an indigent. After proper Affidavit of Indigency was filed, Richard Catalano, Esquire, was appointed and he filed a Brief and argued the Motion before this Court.

As part of the record, Mr. Catalano presented an Affidavit from the former counsel, Janavitz, stating in pertinent parts as follows:

"1. That he was originally retained by Richard Laverne Brewer to represent him in the above-captioned criminal matter, on a private fee arrangement basis;

2. That in discussing the case with Mr. Brewer prior to trial, he advised Mr. Brewer that in order to have a handwriting expert of his own review the matter and appear in court to testify, it would cost Mr. Brewer approximately $1,500.-00 to $2,000.00;

3. That Mr. Brewer indicated clearly that he was unable to pay such an amount and, therefore, the services of an expert were never made available to Mr. Brewer;

4. That Mr. Brewer was never able to pay his full fee and only a token amount was received from him prior to trial;

5. That in his opinion, it may have been in the best interests of Mr. Brewer to have asked the court to declare him an indigent prior to trial so that he could have received appointed counsel and the services of an expert to testify on his behalf in order to properly protect his interests and to insure a fair trial."

The Government did not choose to file any counter affidavits or a brief, but argued contra the Defendant's Motions.

On March 31, 1972, a group of forty blank American Express Money Orders was sent by mail from the American Express Company in Trenton, New Jersey, to one of its agencies which was maintained at Giant Eagle Supermarket Store Number 8, located on Beaver Avenue in the City of Pittsburgh. A trust receipt was to be signed by the appropriate personnel at the Supermarket and returned to the Express Company, again by mail, to verify that the money orders had in fact been received. When the trust receipt was not received by the American Express Company, a reminder letter was sent to Giant Eagle requesting information as to whether or not the money orders had been received. On July 28, 1972, the particular money order charged in the Indictment, and one of the group of money orders sent from American Express to the Giant Eagle

---

1. 18 U.S.C. § 2314 provides in its pertinent part:
   "Whoever, with unlawful or fraudulent intent, transports in interstate or foreign commerce any falsely made, forged, altered, or counterfeited securities or tax stamps, knowing the same to have been falsely made, forged, altered, or counterfeited;
   . . . . ."

Supermarket, was presented through banking channels at the New York Office of the American Express Company and was paid.

Normally the Trenton Office, at approximately three week intervals, would request by letter that Giant Eagle acknowledge receipt or non-receipt of the forty money orders. But as copies of these letters are not kept, the Government offered only a letter dated August 23, 1972, some five months after the original shipment, asking for information from Giant Eagle on the receipt of the money orders. In August of 1972, and by phone, it was indicated to the American Express Company that the money orders had not been received as far as the records of Giant Eagle were concerned.

Upon realization by the Local Giant Eagle Supermarket of the deficiency, the Regional Office Manager, Louis Mendlow, directed the Security Officer of Giant Eagle to make an investigation. Upon examination of the money order in question, which was forwarded to the Security Officer, it was determined that the money order was cashed at Store Number 8 and deposited into the Giant Eagle Account at the Chateau Plaza Branch of Mellon Bank, located next to the Store. There were other money orders also that apparently had been forged and cashed and deposited into that account (this evidence was received without objection by Counsel for the Defendant). After this examination, the checks were turned over to the custody of Special Agent Joseph Vidovich of the Federal Bureau of Investigation.

Giant Eagle's Security Officer testified that there was a storewide policy that money orders are not to be cashed except in the case of a person coming in and purchasing a money order and then returning shortly thereafter, it could be cashed for the face value. Money orders are also not permitted to be accepted in payment of purchases. Check cashing is done only for customers who have filled out check cashing reference cards and who have received a key number author-

izing checks to be cashed in that particular store.

Only three persons were authorized to prepare and sell money orders in Giant Eagle Stores and they were the Manager, the Assistant Manager, and the "third man". During the period from March to August of 1972, Richard Brewer, the Defendant, was the Manager of Store Number 8, the Assistant Manager was Edward Cerny, and the "third man" was Roland Curry.

The Security Officer examined the books of Store Number 8 for a record showing the completion of the sale of the money orders and the deposit of the money. Such a record is normally kept at the Main Office where the book is sent from the Store, and is then sent on to the American Express Company. However, in this instance, a very thorough search of the records did not disclose any record of the money orders contained in the two missing books which had never been acknowledged to have been received at Store Number 8. Nor was there any record, any place, of the sale of any of these money orders. During the investigation by the Security Officer, and prior to going to the Federal Bureau of Investigation, the Security Officer talked to the Defendant who *denied knowing anything about them.* The Officer also interviewed Mr. Curry and Mr. Cerny, and no one seemed to know anything about the money orders. Further, the Security Officer took Defendant to the Company Office and had him examine the money orders that had been cashed; photostatic copies having been forwarded from the Trenton Office. Mr. Brewer could not recall the money orders but said he was aware of some of the names as being on their approved check cashing list, and later Brewer and the Security Officer went back to Store Number 8 and they did come up with several of the names on the money orders but not the name of Emma Cylesta. In checking over the list they came upon one of the "purchasers" of a money order who died several months prior to the cashing of the

money order with his name on it and several other purchasers who had moved out of the area before the time of the receipt of the money orders with their names thereon. Polygraph tests were given to all three of the management people at Store Number 8. The Security Officer went with Brewer to the Mellon Bank, Chateau Plaza Office, to check further on the deposit of the money orders into the Giant Eagle Account. At the bank, several of the money orders were found that were among the forty missing money orders. None of the money orders were touched at any time by the Defendant Brewer during the course of the investigation. These money orders were then turned over to the Federal Bureau of Investigation.

The F.B.I. Agent, as part of his investigation, interviewed the Defendant, who denied ever having seen the money orders before the investigation by the Security Officer. He was asked specifically if he had ever touched the money orders and he informed the Agent that he did not know anything about them. The Agent was most careful to point out that Mr. Brewer was given no opportunity to handle the money orders. Mr. Brewer did state to the Agent that the management team was solely responsible for the issuance of money orders and that because of this, he felt it would take a person in a management position to have cashed such an item, contrary to the rules of the Company.

The Agent also secured some handwriting samples from the Defendant and together with the money orders picked up at the bank (which, as previously noted, had not been handled by the Defendant during the investigation) were sent to the F.B.I. Laboratory in Washington, D. C. for examination for handwriting and fingerprint purposes.

Agent William Newbrough of the Washington Office, a Document Examiner, qualified by special training and study in such examination, examined the particular money order payable to Emma Cylesta which was enclosed in a plastic envelope. He made photographs of the money order and compared the endorsement with the handwriting samples. The opinion of Agent Newbrough was that the Defendant had forged the endorsement on the back of the money order.

The Agent was vigorously questioned on cross-examination with respect to the particular characteristics or style of the letters which had been used for comparison. The Agent brought out that the large number of exemplars and the particular characteristics of the writer made identification of the Defendant as the endorser very clear.

Albert Rose, a Fingerprint Examiner from the Washington Office, testified without objection that he had been able to take off a latent fingerprint impression from one of the American Express Money Orders identified as being missing and payable to Elizabeth Bosco. He identified the print as being made by the same finger as the finger that made the print identified as being the ink print of the Defendant Brewer on one of the money orders which the Defendant Brewer denied ever knowing anything about.

Richard Laverne Brewer testified about being hired by Giant Eagle in 1960 as a Stock Boy and working his way up to Assistant Manager six years later, and then to Manager during 1971 through 1973. He denied knowing anything about any missing money orders until August of 1972, when the Security Officer came in to discuss the situation with him. He denied having received any notice about these missing money orders because he said he was off work because of sickness from May 2nd until July 12th and had no contact with business during that period; part of the time he was in the hospital for a disc operation on his neck. He described how mail was very frequently left on a brick ledge which formed part of the wall surrounding the office portion inside the store, leaving, of course, the inference that other people had access to the mail, including money orders. While the store was doing about $30,000.00

business a week, they would write only about five money orders in that same period. Just prior to going to the hospital, Brewer had borrowed $1,700.00 from the Credit Union but maintained that he had no need to have falsified any of the money orders. In his absence from work, Roland Curry and Edward Cerny were the only employees of the Store who had keys. He testified about taking a lie detector test and immediately returning to work. Later on, he claims, representatives of the business came and told him they definitely were going to pin the money orders on him but if he would plead guilty, they would make it easier on him. He insisted that at that time he had denied having had anything to do with the money orders.

Brewer further testified that in September he was called by one of the Mellon Bank Tellers and he and the Security Officer went to the bank and it must have been at that time that his fingerprint got on the money order since he had never seen the money order before. This, of course, was in direct contradiction to the testimony of the Security Officer who had stated that he (Brewer) had never handled the money orders at the bank. Brewer specifically denied ever executing the name of Emma Cylesta as charged in the indictment or of cashing that particular money order.

On cross-examination the Defendant admitted that he was working on July 26, 1972, the date that the money order named in the indictment was deposited in the Mellon Bank. Also, he admitted that normally he would have been the one who would have checked the money order but not necessarily so if he worked a different shift than the one during which the money order was received. When asked if he could explain how his fingerprint appeared on Exhibit 7, in light of his testimony that he never saw or handled that money order, he stated as follows at Page 175 of the Transcript:

"A. I can't explain it. The only thing that I could say is if my fingerprints is on one, it should have been on all of them. They must have came into that store and I checked them out, and put the money orders in the safe, unless it was one of the money orders that I picked up at the bank.

Q. Didn't you testify or didn't you tell Agent Vidovich that you never saw that group of money orders?

A. Yes, I did.

Q. Didn't you tell him that you never received that group of money orders?

A. Yes, I did, and I didn't remember ever touching those money orders until the end of March when I informed my attorney."

On rebuttal, the Security Officer testified positively that the Defendant did not touch the money orders at the bank when he and the Defendant went to the bank to examine them. This testimony was verified by Mr. Irwin Siegel, who had gone to the bank with the Security Officer and the Defendant.

Both Edward Cerny and Roland Curry denied having anything to do with the missing money orders and testified on behalf of the Government that only the Manager, the Assistant Manager and the "third man" would have had any access to these money orders.

The Court in a rather lengthy charge, to which no exception was taken, explained that to find the Defendant guilty, the Government must prove beyond a reasonable doubt that the Defendant willfully caused a spurious money order to be transported in interstate commerce. The attention of the jury was focused on the fact that the indictment related to only one money order, payable to Emma Cylesta. The jury was told that two of the witnesses were experts employed by the Federal Bureau of Investigation and that such opinion evidence is offered solely to aid the jury in coming to a proper conclusion and that an opinion is not a statement of fact but may be given only such weight

as the jury thinks it deserves. The Court outlined the Defendant's contentions that the American Express Money Orders were shipped to the Giant Eagle in March of 1972; that no inquiry was made for a period of some five months as to why no trust receipt was signed; that when the Security Officer for Giant Eagle made an investigation, the three managerial people who were in a position to know something about the situation were questioned; that the mail was available to other people beside Mr. Brewer; and his claim that he had nothing to do with these money orders. The jury then retired at 10:40 A.M. and returned at 5:23 P.M. with the verdict of guilty.

The Defendant then filed his Motion for New Trial based on the allegations that 1) the Court erred in denying Defendant's Motion for Acquittal made at the conclusion of the Government's evidence, 2) the verdict is contrary to the weight of the evidence, and 3) the verdict is not supported by substantial evidence. Argument was held on the Motion as previously stated and the Defendant in his Brief filed thereafter contends:

1. A review of the testimony demonstrates that the verdict was not supported by substantial evidence and, therefore, that the Court erred in denying Defendant's Motion for Acquittal made at the conclusion of the Government's evidence.

2. Defendant asserts he should be granted a new trial since he was substantially prejudiced and deprived of a fair trial by reason of the fact that he was effectively denied the assistance of an expert witness to testify on his behalf.

As stated by our Circuit in United States v. Feldman, 425 F.2d 688 (3rd Cir. 1970) in an opinion by Circuit Judge VanDusen, the following appears (at p. 692):

"On a motion for judgment of acquittal at the close of the Government's case, the evidence and the inferences to be drawn from it must be taken in the light most favorable to the Government. E. g., Hale v. United States, 410 F.2d 147 (5th Cir. 1969); see Crawford v. United States, 126 U. S.App.D.C. 156, 375 F.2d 332, 334 (1967). Where the motion is waived by the presentation of evidence by the defendant in his own behalf and then renewed at the close of all the evidence, as in this case, the sufficiency of the evidence must be judged upon the record as a whole. E. g., Cline v. United States, 395 F.2d 138 (8th Cir. 1968)." (Emphasis supplied).

Also, in the recent case of United States v. Belgrave, 484 F.2d 915 (3rd Cir. 1973), Judge Gibbons set forth the following (at p. 916):

". . . . At his retrial the Government's case consisted of introducing in evidence his selective service file and of establishing that he did not appear on April 10, 1970, at the place designated for the physical examination. Belgrave moved at the end of the Government's case for a judgment of acquittal. *See* Fed.R. Crim.P. 29. That motion was denied and the defense presented testimony. The motion for a judgment of acquittal was renewed at the end of the entire case, and after the jury verdict, and was in both instances denied, D. C., 351 F.Supp. 686. *This court still adheres to the view that in considering an appeal from the denial of a motion for judgment of acquittal, if the defendant has presented testimony, we judge the sufficiency of the evidence by the entire case.* United States v. Feldman, 425 F.2d 688, 692 (3d Cir. 1970). Thus we must consider both the Government's evidence and that presented by Belgrave." (Emphasis supplied).

A careful examination of this record as a whole discloses that the jury could properly infer that in the Defendant's managerial position he had access to the incoming mail, including the money orders mailed to the Store by the American Express Company. The jury could then

find that the particular money order in question was cashed and deposited to the account of Giant Eagle just shortly after the Defendant returned to work after a stay in the hospital for back surgery; that the signature of the payee on the money order in question was placed there in the same handwriting as that of the Defendant and was in fact in the Defendant's handwriting. The jury could also have found under all of the evidence in this case that the Defendant did not have access to the money order (despite the Defendant's protest to the contrary) so that a fingerprint identified as his could have been placed on one of the money orders, if not the money order in question, prior to the time that the money order was cashed and that, therefore, the whole explanation of the Defendant concerning his complete lack of knowledge of the whereabouts of the missing money orders was a fabrication.

The Defendant earnestly contends that the testimony of Agent Newbrough was the only evidence directly linking him with the money order in question and that it was insufficient as a basis for the jury's verdict. It will be recalled that Agent Newbrough, after explaining how he analyzed the various writing samples taken from the Defendant and compared them with the signature of the payee on the endorsement of the money order, stated that in his opinion the same writer had prepared the handwriting sample and the endorsement, or in other words, it was his opinion that the Defendant was the writer who prepared the endorsement on the back of the money order in question. He further testified that he was unable to make a positive identification of the Check-Writer (the check writing machine) which had been offered in evidence as the one which was used to prepare the check in question because of lack of distinguishing characteristics. On cross-examination, he admitted he had attempted to compare other endorsements on the remaining money orders with the samples of the Defendant's handwritings which were supplied to him, and stated that

none of the handwriting samples could be identified positively as ones made by the Defendant. The part that the Defendant overlooks is that, however he may argue about the opinion of the expert, there is no question that in the opinion of the expert the Defendant had written the endorsement of the payee on the money order in question. The mere fact that the Government maintained throughout the case that the Defendant had the exclusive access and control over all the money orders from the time they arrived at the Store, and they were presented for collection in New York City, did not weaken the inference which the Government asked the jury to draw from that evidence, that the Defendant was guilty of forging the endorsement of the particular money order charged in the indictment.

The Defendant does not cite, nor has the attention of the Court been drawn to, any case where a jury's verdict would not be upheld for insubstantiality of the evidence solely on the proposition that it was an expert's handwriting analysis that made the necessary connection between the forged instrument and the Defendant. Nor do we believe such a case could be cited.

■■ On reviewing the Motion for Acquittal, the verdict of the jury must be sustained if there is substantial evidence, taking the view most favorable to the Government. Glasser v. United States, 315 U.S. 60, 80, 62 S.Ct. 457, 469, 86 L.Ed. 680 (1942); United States v. Blair, 456 F.2d 514 (3rd Cir. 1972); United States v. Provenzano, 334 F.2d 678, 683–684 (3rd Cir. 1964) cert. denied 379 U.S. 947, 85 S.Ct. 440, 13 L.Ed.2d 544 (1964). The evidence need not exclude every other hypothesis interpreting the fact adduced at trial, provided that they do establish a case from which the jury can find the Defendant guilty beyond a reasonable doubt. United States v. Boyle, 402 F.2d 757 (3rd Cir. 1968) cert. denied 394 U.S. 934, 89 S.Ct. 1207, 22 L.Ed.2d 464 (1969); United States v. Giuliano, 263 F.2d 582, 584 (3rd Cir. 1959) as adopted from

United States v. Allard, 240 F.2d 840 (3rd Cir. 1957), reflecting the Supreme Court's decision in Holland v. United States, 348 U.S. 121, 135–136, 75 S.Ct. 127, 99 L.Ed. 150 (1954).

In this case, the evidence presented a clear situation where the Defendant is guilty beyond a reasonable doubt if the jury concludes that the Defendant's explanation as to how his fingerprints might have been added to the money order in question was not believable. The question then became whether the circumstantial evidence strongly supported the inference that the Defendant was guilty. Brewer was the Manager of the Store to which the money orders were sent and, although he denied ever seeing the money orders before, his fingerprint was on the money order in question. This check was deposited in the Mellon Bank Account after he had returned to work from an experience at the hospital, and together with the proof of his handwriting, was such circumstantial evidence as would permit a finding that Brewer was involved in the money order fraud. Were we to look on this evidence most charitably in favor of the Defendant, it nonetheless leads to the conclusion that, in light of the overwhelming evidence against him, he was guilty as charged. The Court, therefore, had to deny the Motion for Judgment of Acquittal at the time of trial, and we now find no merit for the Court's denial of such Motion to be used as the grounds for the Motion for New Trial.

As to the allegations of the verdict being contrary to the weight of the evidence and not being supported by substantial evidence, this Court finds that they also do not have merit. The Motion for New Trial, under the evidence, must be denied on these grounds for the verdict will be sustained if it is supported by substantial evidence. United States v. Pizzi, 470 F.2d 681 (3rd Cir. 1972); United States v. Hamilton, 457 F.2d 95 (3rd Cir. 1972); United States v. DeCavalcante, 440 F.2d 1264, 1273 (3rd Cir. 1971).

The testimony has been discussed above and shows that there was substantial, if not overwhelming, evidence to support the verdict. A fair reading of the evidence compels the conclusion that once the jury, as was its function, determined the credibility of the witnesses (Glasser v. United States, *supra*; United States v. Pizzi, *supra*), the Defendant could be found to have handled the money orders prior to their being cashed, since his hand forged the endorsement of the payee and his fingerprint was on one of the money orders. Therefore, the jury concluded that the Defendant was guilty of the offense charged.

The Motion of the Defendant for New Trial is, therefore, denied and an appropriate order will be entered.